## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

United States of America,                        Case No. 21-cr-157 PAM/ECW

                        Plaintiff,

v.                                                          **REPORT AND**
                                                            **RECOMMENDATION**

Douglas Robert Finch (1);
Danny William Gehl, Jr (2);
David William Gehl (3);
Frank Joseph Kittleson (4);
Patrick Thomas Maykoski (5); and
Daniel Richard Thomas (6),

                        Defendants.

_____

        This matter is before the Court on Defendant Douglas Robert Finch's Motion to

Suppress Any Evidence Obtained as a Result of Any Illegal Searches (Dkt. 66);

Defendant Daniel Richard Thomas' Motion to Suppress Physical Evidence Seized

Pursuant to Warrant (Dkt. 75); Defendant Patrick Thomas Maykoski's Motion to

Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 92); Defendant

Patrick Thomas Maykoski's Motion to Dismiss Count II of the Indictment (Dkt. 94); and

Defendant David William Gehl's Motion to Suppress – Search and Seizure Warrants

(Dkt. 118).

        This case has been referred to the undersigned United States Magistrate Judge for

a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  The

Court held a hearing on the Motions on November 2, 2021.  (Dkt. 129.)

Thomas Hollenhorst, Assistant U.S. Attorney, appeared on behalf of the United States of America ("the Government"); Thomas Shiah appeared on behalf of Defendant Douglas Robert Finch, who was present at the hearing; James Behrenbrinker appeared on behalf of Defendant Patrick Thomas Maykoski, who was present at the hearing; Marcus Almon appeared on behalf of Defendant Danny William Gehl, Jr., who was present at the hearing; Bruce Nestor appeared on behalf of Defendant David William Gehl, who was present at the hearing; Robert Lengeling appeared on behalf of Defendant Frank Joseph Kittleson, who was present at the hearing; and Daniel Guerrero appeared on behalf of Defendant Daniel Richard Thomas, who was present at the hearing.

## I.    DEFENDANT DOUGLAS ROBERT FINCH'S MOTION TO SUPPRESS EVIDENCE SEIZED AT THE CENTURY AVENUE RESIDENCES AND CALIFORNIA WAREHOUSE (DKT. 66)

Defendant Douglas Robert Finch ("Finch") seeks to suppress evidence seized pursuant to search warrants (Gov't Exs. 5 and 6) executed at two Century Avenue North residences in Maplewood, Minnesota ("Century Avenue Residences"), as well as a warehouse located in California ("California Warehouse") (Gov't Ex. 13).[1]  (*See* Dkt. 139 at 3-4.)

---

[1]    Finch initially sought suppression with respect to a number of search warrants as part of his motion to suppress.  (Dkt. 66.)  At the hearing, the Court instructed the parties to specifically identify the warrants that they seek to suppress and the basis for the suppression.  (Dkt. 134 at 20.)  Finch's attorney narrowed the search warrants to those of the Century Avenue Residences and the California Warehouse.  As such, the Court deems Finch's motion to suppress any warrants other than those for the Century Avenue Residences and the California Warehouse as withdrawn.

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). In reviewing the decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. *See Gates*, 462 U.S. at 238-39 (citation omitted); *see also United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found

within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

Given this standard of review, the Court will now proceed with determining whether the search warrants at issue are supported by probable cause.

## A.    Century Avenue Residences

As part of the June 24, 2021 search warrant applications for the Century Avenue Residences, Special Agent John Tschida ("SA Tschida") of the Internal Revenue Service, Criminal Investigation Division, stated in his Affidavit supporting the issuance of the two search warrants as follows:

> In September 2020, the Ramsey County Violent Crime Enforcement Team (VCET) received a "Crime Stoppers" tip from a concerned citizen ("CC") who stated that Finch, Maykoski, and Dave (believed to be David Gehl) were receiving and distributing marijuana. The CC said that these men would fly to California once a month to purchase marijuana, which they would then ship back to Minnesota. The CC said that Finch had "hundreds of pounds" of marijuana at a home he was building next to his residence in the area of Century and Minnehaha Avenues in Maplewood, Minnesota. The CC also said that Finch had stolen vehicles at his residence including two "Bobcat" construction vehicles.
>
> Law enforcement has identified XXX Century Avenue North, Maplewood, Minnesota, and XXX Century Avenue North, Maplewood, Minnesota, as the properties to which the CC was referring. According to Minnesota property records, both are owned by Christine Kampa and are located next to each other. The residence at XXX Century Avenue is under construction, but nearly finished. Investigators have regularly seen Finch at XXX Century Ave North. In addition, trash pulls reveal that Finch and Kampa are receiving mail at both addresses. Shortly after receiving the "Crime

Stoppers" tip, investigators spotted a "Bobcat" construction vehicle at XXX Century Avenue North with the serial number plate removed and the model number painted over.

(Gov't Exs. 5-6 ¶¶ 7-8.)[2]  The two Century Avenue Residences share a driveway.  (*Id.* ¶ 45.)

In addition, the Affidavit set forth the following facts learned over the eight previous months with respect to a suspected drug trafficking and money laundering organization ("DTO") whose members included Finch, David William Gehl ("David Gehl"), Danny William Gehl, Jr. ("Danny Gehl"), Frank Joseph Kittleson ("Kittleson"), Patrick Thomas Maykoski ("Maykoski"), and Daniel Richard Thomas ("Thomas"):

Investigators identified a warehouse located at XXXX Energy Park Drive, Saint Paul, Minnesota ("D & D Systems warehouse" or "Minnesota Warehouse").  (*Id.* ¶ 9.) The Minnesota Secretary of State records revealed that this address was listed as the business address for D & D Systems and identified Joshua Finch, Finch's nephew, as the registered business owner.  (*Id.*)  D & D Systems was incorporated in 2015, was purportedly engaged in the business of custom computer programming services, and was listed as "inactive."  (*Id.*)  The telephone number listed for the business was a cellular telephone number used by Defendant Finch.  (*Id.*)  Agent Tschida could find no online information or records for D & D Systems that would indicate it was engaged in any legitimate business activities.  (*Id.*)

---

[2]    Government Exhibits 5 and 6 are the search warrants for the respective Century Avenue Residences and use the same supporting Affidavit from SA Tschida.

Investigators had also identified the California Warehouse, located at XXX Orange Grove Avenue, North Highlands, California, which Agent Tschida claimed was being used by the DTO to load marijuana into crates for shipment to Minnesota. (*Id.* ¶ 10.) The investigation revealed that this was the address for "Modern Waters," a California business established in 2017, and Agent Tschida could find no information or records for this business that would indicate that it was engaged in any legitimate business activities. (*Id.*)

Banking records revealed that from 2015 through the present, the DTO had deposited approximately $235,000 in cash into a bank account for D & D Systems and that the business paid rent for the two warehouses referenced above. (*Id.* ¶ 11.) These banking records also revealed that the DTO spent over $50,000 in shipping costs and spent approximately $130,000 on warehouse rent from 2015 to the present. (*Id.*) The DTO has also used the D & D Systems bank account to pay expenses for Modern Waters. (*Id.*) Investigators had obtained surveillance videos for September and October 2020, which showed a person who appeared to be Finch making drive-through deposits to the account for D & D Systems. (*Id.*)

In addition, SA Tschida represented that shipping records revealed that from 2016 to the present, D & D Systems and Modern Waters had shipped crates back and forth to each other on at least 61 occasions. (*Id.* ¶ 12.) The shipping weights for crates sent from Minnesota to California were usually about 300 to 500 pounds lighter than the crates sent from California to Minnesota. (*Id.*) From September 2019 through April 2021, invoices for shipments from D & D Systems to Modern Waters reflect that the crates (which

measured 48 by 48 by 80 inches) purportedly contained some variation of either water heaters, solar panels, or parts. (*Id.*) From August 2019 through December 2020, the shipping records reveal that Modern Waters shipped similar crates to D & D Systems again listing the contents as some variation of either water heaters, solar panels, or parts. (*Id.*) The invoices were signed using multiple names, some illegible, and included the purported signature of Maykoski. (*Id.*)

The shipping records also showed that on January 25, 2021, the DTO shipped three crates from D & D Systems to Modern Waters. (*Id.* ¶ 13.) The crates arrived on February 1, 2021. (*Id.*) Flight records show that Finch, Maykoski, and David Gehl flew to California the day before, on January 31, 2021. (*Id.*) When they arrived, Finch rented two vehicles with a return date of February 5, 2021, and Maykoski rented another vehicle with a return date of February 6, 2021. (*Id.*) Telephone location data for Maykoski and Finch's cellular telephones revealed that their telephones were in Redding, California from February 2 to February 4, 2021. (*Id.*) They were then tracked to the Sacramento area on February 5, 2021. (*Id.*) On February 5, 2021, investigators saw David Gehl load three crates onto a delivery truck at the Modern Waters warehouse. (*Id.*) After the truck was loaded and had departed, Finch arrived and went into the warehouse for approximately seven minutes. (*Id.*) David Gehl and Finch then left the warehouse and drove away. (*Id.*) Shipping records revealed that the truck was contracted to deliver the crates from the Modern Waters warehouse to the D & D Systems warehouse. (*Id.*)

On February 17, 2021, investigators saw David Gehl, Maykoski, and Kittleson parked in a vehicle near the D & D Systems warehouse and shortly thereafter, the

delivery truck that had left from the Modern Waters warehouse on February 5, 2021, arrived at the D & D Systems warehouse. (*Id.* ¶ 14.) David Gehl went into the warehouse, came out driving a forklift, and off-loaded three crates from the truck and placed them in the warehouse. (*Id.*) Investigators then saw Gehl sign paperwork provided to him by the truck driver, which was obtained by investigators. (*Id.*) The signature on the paperwork was "Dennis Smith" instead of Gehl's name. (*Id.*) Investigators then saw Maykoski walk into the D & D Systems warehouse with what appeared to be a box of garbage bags and then walk out of the warehouse and place five garbage bags, three large cardboard boxes, and four smaller cardboard boxes into his pickup truck. (*Id.* ¶ 16.) Maykoski then drove to his residence at XXX East Maryland Avenue, Saint Paul, Minnesota, and carried all of these items into the house. (*Id.*) Investigators then observed Kittleson arrive at the warehouse, place five large garbage bags and two cardboard boxes which he had obtained from the warehouse into his truck, and then drive directly to his residence at XXXXX Meadow Lane Northeast, Blaine, Minnesota. (*Id.* ¶ 17.) Approximately 40 minutes later, investigators saw Finch arrive at the warehouse, where he placed four large garbage bags and approximately 10 cardboard boxes into his vehicle. (*Id.* ¶ 18.) Investigators then followed him directly to the Century Avenue Residences, where he placed these items into the garage of one of the residences. (*Id.*) Investigators also observed thereafter Danny Gehl and David Gehl arriving in two separate vehicles and placing multiple bags and cardboard boxes into the vehicles and then drive and place the bags and boxes in a residence at XXX Sims Avenue, Saint Paul, which is the home of their mother, Marie Gehl. (*Id.* ¶ 19.)

On April 5, 2021, three crates were shipped from the D & D Systems warehouse. (*Id.* ¶ 20.) On that date, investigators saw David Gehl's silver Chevrolet Malibu parked near the warehouse. (*Id.*) Shortly thereafter, Maykoski drove into the parking lot, got out of his vehicle, and entered the warehouse. (*Id.*) About five minutes later, a delivery truck arrived and David Gehl then used a forklift to load three crates onto the truck. (*Id.*) After the delivery truck left, David Gehl and Maykoski shut the overhead garage door of the warehouse and drove off in their vehicles. (*Id.*) Shipping records reflect that the crates arrived at the Modern Waters warehouse on April 12, 2021. (*Id.*)

Investigators saw David Gehl at the Modern Waters warehouse on April 16, 2021. (*Id.* ¶ 21.) Shipping records reflect that on that date, three crates were shipped from the Modern Waters warehouse destined to arrive at the D & D Systems warehouse on April 26, 2021. (*Id.*)

On April 26, 2021, investigators saw pickup trucks belonging to Kittleson and Thomas parked near the D & D Systems warehouse, as well as observed Maykoski walk into the warehouse. (*Id.* ¶ 22.) Shortly thereafter, the shipping truck arrived, and Thomas was seen off-loading three crates from the delivery truck and placing them in the warehouse. (*Id.*) Thomas then signed paperwork handed to him by the truck driver and again entered the warehouse. (*Id.*) About 50 minutes later, Danny Gehl arrived and went into the warehouse. (*Id.*) About two hours later, investigators saw Kittleson come out of the warehouse and place five large garbage bags and four cardboard boxes in his pickup truck. (*Id.*) Investigators then followed him to his residence at XXXXX Meadow Lane, Blaine, Minnesota. (*Id.*)

Shortly after Kittleson left the warehouse, investigators saw Thomas come out of the warehouse and place one large garbage bag and three cardboard boxes into the back of his truck. (*Id.* ¶ 23.) Investigators followed him to XXX Como Avenue, Saint Paul, Minnesota, where he backed his vehicle up to the garage and met with Brian Arndt. (*Id.*) He then placed the items from his truck in the garage. (*Id.*) Investigators then tracked Thomas to his residence at XXXXX 138th Avenue North, Dayton, Minnesota. (*Id.*)

Shortly after Thomas left the warehouse, investigators saw Danny Gehl come out of the warehouse and place two large garbage bags and four cardboard boxes into the trunk of his Chevrolet Malibu. (*Id.* ¶ 24.) During this time, investigators also saw Maykoski place two large black garbage bags and three cardboard boxes in his vehicle. Both Danny Gehl and Maykoski then drove their vehicles to XXX Sims Avenue East, Saint Paul, Minnesota, where they brought these items into the residence. (*Id.*) They then drove their vehicles back to the D & D Systems warehouse, where Maykoski placed two large garbage bags and six cardboard boxes into his vehicle. (*Id.*) Maykoski drove to his residence at XXX Maryland Avenue East, Saint Paul, Minnesota, where investigators saw him bring these items into his residence. (*Id.*)

On June 6, 2021, tracking information established that David Gehl's silver Chevrolet Malibu and Kittleson's GMC Yukon were at the D & D Systems warehouse. (*Id.* ¶ 25.) On June 7, 2021, investigators saw David Gehl and Maykoski place three crates onto a delivery truck destined for the Modern Waters warehouse. (*Id.*)

On June 14, 2021, telephone tracking data established that the cellular telephones used by Finch, Maykoski, and David Gehl were all in the vicinity of the Modern Waters

warehouse.  (*Id.* ¶ 26.)  Telephone tracking data also established that on June 15, 2021,

Kittleson's cellular telephone was located north of Redding, California, on a plot of land

owned by a Saint Paul resident.  (*Id.* ¶ 26.)  A "Google Earth" photograph of this plot

taken within the last year showed what appeared to be marijuana growing on the

property.  (*Id.*)

Shipping records reflect that on June 18, 2021, three crates weighing

approximately 2,545 pounds were loaded onto a delivery truck at the Modern Waters

warehouse destined for the D & D Systems warehouse.  (*Id.* ¶ 27.)  The shipment was

due to arrive on or about June 28, 2021.  (*Id.*)  Telephone tracking data reflected that the

cellular telephones used by Finch, David Gehl, Kittleson, and Maykoski were all located

in the vicinity of the Modern Waters warehouse on June 20, 2021, and that all four

telephones were back in Minnesota as of the date of the June 24, 2021 search warrant

application.  (*Id.*)

The search warrant Affidavit also set forth information discovered regarding

Finch's financial situation.  Specifically, the Affidavit states that Finch purchased a 2019

Bennington Pontoon for $103,918.52 with a cash deposit of $15,000.00.  (*Id.* ¶ 43.)  He

falsely listed his employment and income on the financing application.  (*Id.*)  Since

January 2021, investigators have never seen Finch engage in any legitimate employment.

(*Id.*)  Moreover, it was noted that Department of Employment and Economic

Development ("DEED") records show no reported wages for Finch for the years 2017

through 2020, however, banking records for Finch for the years 2019 and 2020 show over

$204,000 in cash deposits.  (*Id.*)

In addition, based upon his experience and training, SA Tschida asserted in his Affidavit that persons engaged in financial and narcotics crimes often use their residences to conceal evidence of their crimes including, financial records, keys and records concerning safe deposit boxes, United States currency, monetary instruments, precious metals, and jewelry obtained from illegal activities. (*Id.* ¶ 65.)

United States Magistrate Judge Tony N. Leung signed the Search Warrants on June 24, 2021, authorizing the search of the Century Avenue Residences for marijuana, items used in marijuana distribution, proceeds, and records.

Finch argues as follows:

In this case, the affidavits supplied only a cursory and temporally unclear explanation as to why the police suspected Mr. Finch of participating in an illegal drug sale operation. They failed to supply the requisite "additional evidence linking the person's home to the suspected criminal activity."

\* \* \*

That affidavit was filed in support of multiple applications for search warrants for multiple locations including XXX Century Avenue North, Maplewood, MN and XXX Century Avenue North, Maplewood, MN. It was based on information received by an unidentified "concerned citizen" that Finch had "hundreds of pounds" of marijuana at a home he was building next to his residence in the area of Century and Minnehaha Avenue in Maplewood, MN. No additional identifying information or addresses were provided. Both of these properties are owned by Ms. Candace Kampa and are located next to each other and the only other allegations were that Finch had been seen regularly at XXX Century Avenue North, and possibly received mail at both addresses. Finally, there was a reference that based on surveillance, investigators had observed Mr. Finch transporting four (4) large garbage bags and approximately ten (10) cardboard boxes placed in a vehicle driven by Finch and that he was followed to the addresses where the items were placed in the garage. There was no indication that anybody bought, sold or stored drugs at either address. Accordingly, there was not the requisite connection required to establish probable cause that criminal activity was afoot at either place.

12

(Dkt. 139 at 3.)

As a starting point, although an anonymous tip is "insufficient in itself to support a finding of probable cause[,]" *United States v. Wells*, 223, F.3d 835, 839 (8th Cir. 2000), "[i]nformation may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *United States v. Morales*, 238 F.3d 952, 953 (8th Cir. 2001) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir.1993)). In determining whether the informant's tip has been corroborated, even innocent activity can provide sufficient support. *See United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (citation omitted). Moreover, not every detail must be corroborated. *See United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995) ("When an informant's information is at least partially corroborated . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.") (marks and citation omitted). Here, the tip was corroborated with respect to a "Bobcat" vehicle located at the Century Avenue Residences with the serial number plate removed and the model number painted over. In addition, the tip was corroborated by shipping records showing at least 61 shipments between D & D Systems and Modern Waters since 2016, as well as law enforcement observations of Finch, Maykoski, and David Gehl going between California and Minnesota on multiple occasions. Indeed, Finch was seen at the Modern Waters warehouse in February 2021, as were Maykoski and Gehl, he was subsequently seen taking boxes and bags from the D & D Systems warehouse shortly after the arrival of the

cases at that location, and taking them to the Century Avenue Residences, and his phone was located in the vicinity of the Modern Waters warehouse on June 20, 2021 prior to another shipment to the D & D Systems warehouse.

Finch claims that there is no nexus between the Century Avenue Residences and narcotics activity. However, this ignores the corroborated tip providing that there were hundreds of pounds of marijuana at the Century Avenue Residences, as well as the ongoing investigation tying Finch to the shipments between Modern Waters and D & D Systems through June 2021, and tying Finch's transport of goods in bags and boxes from D&D to the Century Avenue Residences at least in February 2021. *See United States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000) ("In this case there was evidence that [the defendant] was engaged in a continuing course of criminal activity, and we believe that it could fairly be inferred that he was keeping a supply of drugs and perhaps other evidence relating to his drug dealing in his home. Although, it is true that neither the informant nor the detective had actual knowledge that contraband was in [the defendant's] home, absolute certainty was not necessary: a fair probability is all that is required."); *see also Carpenter*, 341 F.3d at 671 (8th Cir. 2003) ("As a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence.").

As set forth above, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence of a crime at the location to be searched. *See Gates*, 462 U.S. at 238. Although each piece of

information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, taken together and given the totality of the circumstances, this Court concludes that a reasonable person could believe there was a fair probability that evidence of a crime would be found at the Century Avenue Residences.

In addition, Finch appears to assert a staleness argument as part of his assertion that the affidavits are temporally unclear.  "While a lapse of time between the observations of a witness and the issuance of a search warrant may render probable cause fatally stale, there is no bright-line test for determining when information is stale." *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (cleaned up).  "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search."  *United States v. C-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (cleaned up).  "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered."  *Gettel*, 474 F.3d at 1086 (cleaned up).  Indeed, "in investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale."  *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (cleaned up).  While the tip was provided in September 2020, the Affidavits provide evidence of an ongoing narcotics operation through June 2021 extensively involving Finch, and as such the Court finds the

information in these Affidavits was not stale as of June 24, 2021, the date Magistrate Judge Leung signed the search warrants.

**B.    Modern Waters California Warehouse**

On July 12, 2021, United States Magistrate Judge Carolyn K. Delaney, Eastern District of California, issued a search warrant for the California Warehouse in North Highlands, California. (Gov't Ex. 13.) As part of the June 24, 2021 warrant application for the California Warehouse, Special Agent Dale Ouse ("SA Ouse") of the Department of Homeland Security provided in his supporting Affidavit in relevant part as follows:

On January 25, 2021, the DTO shipped three crates from the Minnesota Warehouse to the California Warehouse. (*Id.* ¶ 9.) The crates arrived on February 1, 2021. (*Id.*) Flight records, telephone location data, and investigators' surveillance records all showed that Finch, Gehl, and Maykoski flew and stayed in California between January 31, 2021 through February 5, 2021. (*Id.*) On February 5, 2021, investigators saw David Gehl load three crates onto a delivery truck at the California Warehouse. (*Id.*) After the truck departed, Finch arrived and went into the California Warehouse for approximately seven minutes. (*Id.*) Shipping records showed that the delivery truck was contracted to deliver the crates from the California Warehouse to the warehouse located at XXXX Energy Park Drive, Saint Paul ("Minnesota Warehouse"). (*Id.*)

On February 17, 2021, investigators saw Gehl, Kittleson, and Maykoski parked near the Minnesota Warehouse and shortly thereafter, the delivery truck from California arrived, the crates were unloaded and placed into the warehouse, and then the

investigators observed multiple individuals go into the warehouse, come out with boxes and bags, and take them to various residences.  (*Id.* ¶ 10.)

On April 5, 2021, three large shipping crates were shipped from the Minnesota Warehouse.  (*Id.* ¶ 11.)  Shipping records reflected that the crates arrived at the California Warehouse on April 12, 2021.  (*Id.*)  Investigators saw David Gehl at the California Warehouse on April 16, 2021, and the shipping records reflect that on that date, three crates were shipped from the California Warehouse destined to arrive at the Minnesota Warehouse on April 26, 2021.  (*Id.* ¶ 12.)  On April 26, 2021, investigators saw Kittleson, Maykoski, and Thomas at the Minnesota Warehouse when the delivery truck arrived and was off-loaded and then observed multiple individuals go into the warehouse and come out with boxes and bags and take them to various residences.  (*Id.* ¶ 13.)

On June 7, 2021, investigators saw David Gehl and Maykoski use a forklift to load three crates onto the back of a delivery truck.  (*Id.* ¶ 14.)  Shipping information revealed that the crates were destined for the California Warehouse.  (*Id.*)

On June 14, 2021, telephone tracking data revealed that telephones used by Finch, David Gehl, and Maykoski were all in the vicinity of the California Warehouse.  (*Id.* ¶ 15.)  Shipping records showed that on June 18, 2021, three crates weighing approximately 2,545 pounds were loaded into a delivery truck at the California Warehouse destined to arrive at the Minnesota warehouse on June 28, 2021.  (*Id.*)

On June 28, 2021, Investigators saw David Gehl, Kittleson, and Maykoski at the Minnesota Warehouse:

At approximately 12:20 p.m., the delivery truck from California arrived. Thereafter, David Gehl used a forklift to off-load the three shipping crates from the truck and place them in the warehouse. Within the next two hours, Finch, Danny Gehl and Thomas arrived. At approximately 2:40 p.m., a federal search warrant was executed at the warehouse. All six men were arrested. Upon entering the warehouse, investigators saw the three crates that had been off-loaded from the delivery truck. Two were completely empty and one was almost empty. Nearby the crates, investigators seized approximately 788 pounds of marijuana, approximately 569 pounds of THC "edibles," and approximately 140 pounds of THC "vape" cartridges.

In follow up search warrants on June 28, 2021, investigators seized approximately $20,000 in cash and drug ledgers from the master bedroom at David Gehl's residence in Lake Elmo, Minnesota; approximately $120,000 in cash, 17 pounds of marijuana and THC edibles, and a 9 millimeter semi-automatic handgun from Finch's two residences in Maplewood, Minnesota; numerous boxes of THC edibles and THC vape cartridges, baggies of suspected cocaine, and drug packaging materials from a "stash house" linked to Kittleson in Blaine, Minnesota; approximately $25,000 in cash, 70 marijuana plants, and 750 grams of cocaine from Kittleson's residence in Blaine, Minnesota; approximately $50,000 in cash, 20 marijuana plants, several pounds of dried marijuana, 10 pounds of THC edibles, and five pounds of THC vape cartridges from Danny Gehl's residence in Saint Paul, Minnesota; a large amount of currency, over 100 pounds of marijuana, and other marijuana products from Maykoski's residence in Saint Paul, Minnesota; and approximately one pound of marijuana, 100 THC edibles, $10,000 in cash, and drug ledgers at Thomas' residence in Dayton, Minnesota.

(*Id.* ¶¶ 16-17.)

In addition, the Affidavit set forth that the California Warehouse appeared to be owned by RSC Partners, LLC. (*Id.* ¶ 18.) Bank records revealed that D & D Systems had been writing checks to RSC Partners to pay the rent for the California Warehouse. (*Id.*) As of July 8, 2021, RSC Partners indicated that D & D Systems was still paying the rent for the California Warehouse, and Finch remained the listed contact for D & D

Systems on the lease. (*Id.* ¶¶ 18-19.) The Minnesota Warehouse was also leased by D & D Systems. (*Id.* ¶ 6.)

Given this information, a reasonable person could conclude that contraband or evidence of a crime might be found in the California Warehouse, including the items sought to be seized by the warrant. SA Ouse established a sufficient nexus between the California Warehouse and the narcotics activity. First, on June 14, 2021, telephone tracking data revealed that telephones used by Finch, David Gehl, and Maykoski were all in the vicinity of the California Warehouse. (*Id.* ¶ 15.) Shipping records reflect that on June 18, 2021, three crates weighing approximately 2,545 pounds were loaded into a delivery truck at the California Warehouse destined to arrive at the Minnesota Warehouse on June 28, 2021. (*Id.*) On the June 28, 2021 arrival date of the crates, officers discovered a large quantity of narcotics near the crates in the Minnesota Warehouse, arrested David Gehl, Finch, Danny Gehl, Thomas, Kittleson and Maykoski on site, and narcotics and large amounts of cash were sized from their residences, including $120,000 in cash, 17 pounds of marijuana and THC edibles, and a 9-millimeter semi-automatic handgun from Finch's two residences in Maplewood, Minnesota. All this, coupled with the fact that D & D Systems was paying the lease on the California Warehouse and the Minnesota Warehouse, the fact that Finch was the listed contact for D & D Systems on the lease for the California Warehouse, and the repeated shipments back and forth between these two Warehouses, leads this Court to find that based on the totality of the circumstances, a reasonable person could believe there was a fair probability that contraband or evidence of a crime would be found at the California Warehouse as of July

12, 2021.  The Court therefore recommends that Finch's motion to suppress the search of the California Warehouse be denied.

## C.    *Leon* Exception

Because the search warrants for the Century Avenue Residences and the California Warehouse were supported by probable cause (as set forth above), this Court need not determine whether the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), should apply.  The Court notes, however, that even if the warrants were deficient, the officers' reliance on the warrants would have been reasonable under *Leon*.

Under *Leon*, "'evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.'"  *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)).  In *Leon*, the court stated that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'"  468 U.S. at 922 (citations omitted).  However, the *Leon* court noted that there are certain instances when "the purpose of the exclusionary rule— deterring police misconduct—will not be served by suppressing illegally seized evidence."  *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at 922-23.  "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the

fruits of the search." *Martin*, 833 F.2d at 755. The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n.23. The reviewing court should consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit . . . ." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). In addition, "even if the information in the warrant affidavit was impermissibly stale, the warrant was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." *United States v. McNeil*, 184 F.3d 770, 775 (8th Cir. 1999) (citations omitted).

In this regard, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

   i.   when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

  ii.   when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;

 iii.   when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

  iv.   when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431). With respect to the third exception, the Eighth Circuit has explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent

opinions that would justify our dilution of the Court's particularly strong choice of words." *Proell*, 485 F.3d at 432 (quoting *Carpenter,* 341 F.3d at 670 ).

Here, the Court does not find that the affidavits were intentionally or recklessly misleading, or that the issuing magistrate judges wholly abandoned their judicial role in issuing the search warrants.  As to the remaining exceptions, the Court has already concluded that the affidavits provided an adequate factual basis for the issuing judges to have found probable cause.  Therefore, based on all the facts and circumstances of this case, it was not "entirely unreasonable" for law enforcement officers to rely on Magistrate Judges Leung and Delaney's issuance of the search warrants at issue.

For all of the reasons set forth above, Finch's Motion to Suppress should be denied.

## II.    DEFENDANT DAVID GEHL'S MOTION TO SUPPRESS (DKT. 118)

Defendant David Gehl ("Gehl") seeks to suppress evidence obtained as the result of the search warrants found at Government Exhibits 1, 3, 12, 13, 14, 19, 25, 26, 32, and 33.  The warrants at issue are grouped into three categories: (1) Exhibits 14 and 19  deal with January 7, 2021 search warrants for financial records belonging to David Gehl; (2) the search warrants at Exhibits 25, 26, 32 and 33 sought cell phone "ping data" and a GPS tracker on Gehl's vehicle; and (3) search warrants found at Government Exhibits 1, 3, 12, and 13 for real property, either the Defendant's residence at XXXX Junco Road North, Lake Elmo, MN ("Lake Elmo Residence"), or the California and Minnesota Warehouses.  The Court addresses each of the categories of search warrants in turn.

### A.    Gehl's Financial Records

Government Exhibit 14 is a search warrant filed in Ramsey County District Court on January 7, 2021, directed to Affinity Plus Credit Union.  Government Exhibit 19 is a search warrant filed in Ramsey County District Court on January 7, 2021, directed to JP Morgan Chase.  Both search warrants are supported by essentially the same Affidavit.  Gehl argues that the search warrants lack sufficient probable cause that financial evidence of illegal marijuana trafficking would be found within these records.  (Dkt. 142 at 3-4.)  The Government counters that Gehl lacks the requisite standing to challenge the seizure of financial records from a third party.  (Dkt. 145 at 6-7.)

"[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *Alderman v. United States*, 394 U.S. 165, 171-72 (1969).  Gehl has no legitimate Fourth Amendment expectation of privacy in financial information he voluntarily turned over to third parties, regardless of any assumption of confidentiality.  *See California v. Greenwood*, 486 U.S. 35, 41 (1988) (holding that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties") (quoting *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)); *see also United States v. Miller*, 425 U.S. 435, 443 (1976) (citing *United States v. White*, 401 U.S. 745, 752 (1971)) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose

and the confidence placed in the third party will not be betrayed.").  Indeed, the United States Supreme Court has held that there is no standing by a defendant under the Fourth Amendment to object to the illegal seizure of his financial records from the financial institutions he uses.  *See United States v. Payner*, 447 U.S. 727, 731-32 (1980); *see also United States v. Cimino*, 219 F.R.D. 695, 696 (N.D. Fla. 2003) (citations omitted) ("There is no Fourth Amendment privacy interest in records held by the bank.").

Given that Gehl lacks a Fourth Amendment privacy interest in the financial information in the possession of third-parties—Affinity Plus Credit Union and JP Morgan Chase—Gehl's Motion to Suppress evidence seized as the result of the search warrants at Government Exhibits 14 and 19 should be denied.

## B.    Cell Phone Ping Data and Tracking Data Search Warrants

Government Exhibit 25 sought authorization for the installation and use of an electronic tracking device, including but not limited to GPS location, for mobile telephone number 612-232-XXXX.  The search warrant was issued by Hennepin County District Judge Richard Kyle on March 2, 2021.

Officer Timothy Filiowich, a police officer with the City of St. Paul, provided the following evidence in relevant part in his affidavit supporting the issuance of the search warrant:

In September of 2020, a Crime Stoppers tip came into the Ramsey County VCET office that Douglas Finch had hundreds of pounds of marijuana at his home, and that he was building a house with drug money.  (Govt' Ex. 25 at 2.)  The tip also stated that Finch's associates included "Pat Maykoski, Dave and Benjamin Hill" and that they fly to

California once a month to purchase marijuana to be shipped back to Minnesota. (*Id.* at 2-3.)

Over the course of the investigation, law enforcement had identified the following individuals that were the subject of the tip: Douglas Robert Finch, Patrick Thomas Maykoski, David William Gehl, and Benjamin Joseph Hill. (*Id.* at 3.) Officer Filiowich represented that he had spoken to a confidential informant ("CI") who was familiar with the DTO at issue; stated that David Gehl has been known to operate with Finch, Maykoski, and Hill; and said that they knew David Gehl goes to California to get marijuana and then ships it back to Minnesota for distribution in the Twin Cities metro area. (*Id.*) On January 25, 2021, Officer Filiowich observed David Gehl load three large pallets into a white freight truck. (*Id.*) On January 31, 2021, Gehl flew to California with Maykoski and Finch and the pallets that were shipped from St. Paul were received in California on February 1, 2021. (*Id.*) On February 5, 2021, Officer Filiowich watched via remote surveillance David Gehl load three pallets onto a freight truck in the Sacramento area of California. (*Id.*) These pallets were set for delivery in St. Paul at XXX Energy Park Drive Suite #7 for the following week, which was the same place the pallets were initially shipped from to California, based on law enforcement surveillance. (*Id.*)

On February 17, 2021, law enforcement officers observed a large shipping truck and trailer arrive at the Minnesota Warehouse, and at that time observed David Gehl driving a forklift and unloading three pallets off the truck and put them into the warehouse. (*Id.*) The trailer number for the vehicle matched the tracking information

provided by the freight shipping company, thereby verifying the delivery from California. (*Id.*)  Law enforcement watched David Gehl sign for the shipment, yet the signature he used on the proof of shipment was "Dennis Smith."  (*Id.*)  Officers also observed Maykoski and Finch with David Gehl on February 17th at the Minnesota Warehouse. (*Id.*)  Officers then saw David Gehl and his brother Danny Gehl load large full garbage bags and boxes into a trunk of a vehicle and then saw David Gehl drive it to his mother's home, where he unloaded at least one of the bags and boxes.  (*Id.* at 3-4.)

In addition, Officer Filiowich provided the following:

- His knowledge that California is considered a source state for marijuana.

- That Gehl uses the 612-232-XXXX number.

- That this phone is in contact with both Maykoski and Finch.

- That Gehl is using this phone number to contact the freight company.

- According to T-Mobile, the cell was active and under the name Timothy Nordstrom, and that in Officer Filiowich's experience he knew that individuals involved with the sale, and distribution of narcotics often use fictitious names in order to thwart law enforcement.

- In 2003, Gehl was sentenced to 14 years for possession and distribution of narcotics and has been the subject of ongoing investigations over the past seven years.

(*Id.* at 4.)

The March 8, 2021 Search Warrant, issued by Ramsey County District Judge Edward Shen, for the tracking warrant of a 2014 silver Malibu bearing Minnesota license plate ALT XXX, contained largely the same operative facts in support of its issuance and also included that the vehicle that David Gehl drove on February 17, 2021 at the

Minnesota Warehouse and to his mother's house was a Malibu with Minnesota license plate ALT XXX, registered to Cheryl Lundeen, with whom David Gehl lives, and that officers had seen David Gehl drive the vehicle numerous times. (Gov't Ex. 32 at 2-3.)

Gehl contends that even under a "totality of the circumstances" analysis for determining the sufficiency of a search warrant application to establish probable cause, the uncorroborated allegations of otherwise innocent commercial activity fail to establish probable cause to track his cellphone and vehicle. Gehl focuses on the fact that the anonymous Crime Stoppers tip only identified a "Dave" as involved with marijuana tracking, but did not include his full name or any description of him. (Dkt. 142 at 4.) He further argues that there was nothing suspicious or illegal about his trips to California that would corroborate the tip, and that the CI's reliability could not be assessed. (*Id.*) Gehl also argues that observations of him traveling to California and loading shipping containers onto trucks, the fact that California is a source state, the fact that Gehl is in contact with Finch and others using a phone registered in the name of another person, and the fact that he has a criminal history is insufficient to establish the requisite probable cause. (*Id.* at 5.)

While the Crime Stoppers tipster only identified a "Dave," the CI identified David Gehl, as did officers through their surveillance. Moreover, while the Affidavit does not set forth why the CI was reliable, the failure to do so is not automatically determinative of reliability. *See United States v. Brown*, 499 F.3d 817, 821 (8th Cir. 2007) ("Brown complains that the affidavit does not elaborate on the officer's basis for describing the CI as reliable. While we agree that this would have been preferable, such elaboration is not

27

essential for the affidavit to support a finding of probable cause.") (citation omitted).
Here, the CI's reliability was corroborated in part by the Crime Stoppers tipster. *See*
*United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir. 1998) ("In fact, the two
informants' tips were reciprocally corroborative, rendering their information enough to
support a finding of probable cause.") (citation omitted); *see also United States v. Barnes*,
No. 0:18-cr-120-ADM-KMM-1, 2019 WL 3293467, at *5 (D. Minn. Apr. 8, 2019), *R. &*
*R. adopted*, 2019 WL 2353659 (D. Minn. June 4, 2019) (same) (citation omitted).
Further, information from a CI is sufficiently reliable if it is corroborated by other
evidence. *See United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (citing *United*
*States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). "Where some information is
independently corroborated, it is permissible for the issuing judge to conclude the
informant and the remaining information provided are reliable, even if uncorroborated."
*United States v. Evans*, 4 F.4th 633, 637 (8th Cir. 2021). "Even the corroboration of
minor, innocent details" can be enough to support a finding of probable cause. *See*
*United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (marks and citation omitted).
Here, through their surveillance and investigation, the officers confirmed Gehl's
involvement with Finch and Maykoski (including making calls using the cell phone at
issue), his travels to California, as well his involvement with shipments between
California and Minnesota. While these may be innocent details, they sufficiently
corroborate the CI's information for the purposes of probable cause. The information
provided by the Crime Stoppers tipster and the CI, coupled with surveillance of Gehl's
travels between the California and Minnesota Warehouses and his involvement with

shipments between them, his use of a fake name to sign for a shipment, and his criminal narcotics history,[3] provided sufficient probable cause for the issuance of the search warrant relating to the 612-232-XXXX number, as well as the GPS tracking warrant for the Malibu with Minnesota license plate ALT XXX, given that the officers also adequately connected David Gehl to the vehicle.  Therefore, the Motion to Suppress as it relates to the issuance of the search warrant for the 612-232-XXXX number and GPS tracking warrant for the Malibu with Minnesota license plate ALT XXX (Gov't Exs. 25 and 32) should be denied.

Gehl also seeks suppression of evidence resulting from the search warrants at Government Exhibits 26 and 33, which are the extension of the warrants at Government Exhibits 25 and 32.  (*See* Dkt. 142 at 2.)  The affidavits for the extension for the 612-232-XXXX number are the same as those for the original warrants, except that they add information about a positive K9 drug sniff and Gehl's further involvement with shipments between Minnesota and California:

> During the month of April your affiant was able to inspect the exterior of the pallets shipped by D & D Systems at the local YRC freight hub located in Burnsville, Minnesota. During that inspection your affiant entered the YRC facility to take photos and conduct a narcotics K9 sniff of the pallets. Your affiant did have a warrant signed by the Honorable Dakota County Judge Michael D. Wentzell to enter the facility and complete the above-mentioned tasks. The warrant was signed on April 5, 2021 which was the same day we

---

[3]    While criminal history is not in of itself sufficient to support probable cause, it is a fact that may be considered.  *See generally*, *United States v. Kattaria*, 553 F.3d 1171, 1176 (8th Cir. 2009) (per curiam) (en banc) (holding that probable cause supported the search warrant for a thermal imaging search of the defendant's residence because the electric power consumption data, coupled with the defendant's prior criminal history involving marijuana trafficking, constituted sufficient evidence of continuing criminal activity).

entered the facility. YRC was cooperative and staff was present while we conducted the sniff and took photos.

Your affiant, along with K9 handler Deputy Ferrian and his K9 partner Milo conducted a narcotics K9 sniff of the shipping containers and/or pallets. They are described as shipping containers made from plywood that sit on a standard pallet. K9 alerted to the presence of a narcotics odor by alerting on all three of the shipping containers.

K9 Milo has been trained in the location and detection of the following narcotic odors: marijuana, cocaine, crack cocaine, heroin, ecstasy and methamphetamine, K9 Milo has been certified by the United States Police Canine Association for narcotics detection.

Your affiant believes the shipping containers being shipped to California are the same containers that are being used during every shipment. Your affiant believes that the positive hit from the K9 shows that there is narcotic residue on and within the pallets.

Your affiant knows on June 7, 2021 another shipment left D & D Systems in St. Paul. 3 pallets were picked up totaling 2,155 lbs, The PRO number from YRC for the shipment was, 677-026859-3. The destination for the pallets is California.

Your affiant observed David Gehl loading the pallets onto a YRC freight truck on June 7th, 2021.

Your affiant knows the pallets are scheduled to be received in California on June 14th Based off past travel patterns your affiant believes David Gehl will be in California to receive the pallets on June 14th, 2021.

(Gov't Ex. 26 at 3-4.)  In the application for the extension of the warrant for the Malibu, Officer Filiowich focused on the K9 sniff and Gehl's additional involvement in the shipments since March 8, 2021 and through all of April 2021.  (Gov't Ex. 33 at 2-3.)

Gehl argues that the Government has failed to establish that the K9 sniff on private property was made pursuant to probable cause or whether the K9 could differentiate between hemp and marijuana.  (Dkt. 142 at 5-6.)  The Government counters that even if

the dog sniff referred to in Government Exhibits 26 and 33 was improper or was irrelevant, excising this information would not have defeated a finding of probable cause.[4] (Dkt. 146 at 7.) This Court agrees. Even assuming that the dog sniff was improper, a search warrant may still stand if the offending portions are removed and the remaining statements in the application would support a finding of probable cause to support the search warrant. *See United States v. Sandoval-Rodriguez*, 452 F.3d 984, 988 (8th Cir. 2006). For the reasons set forth as to Exhibits 25 and 32, *supra*, the Court finds that their extensions are supported by probable cause even without the positive K9 sniff, particularly since they outline Gehl's continuing involvement with shipments between California and Minnesota close in time to the issuance date of the extensions.

Even assuming that the search warrants lacked sufficient probable cause, the Court finds that the *Leon* exception would apply as they are not "so lacking in indicia of probable cause" so as to render Officer Filiowich's reliance upon the search warrants entirely unreasonable. Rather, the supporting affidavits set forth sufficient indicia connecting the cell phone and Malibu to Gehl in conjunction with the ongoing shipments involving the DTO such that a law enforcement officer could reasonably believe the tracking warrants and extension were supported by probable cause. Finally, there is no suggestion (and Gehl has not argued) that the affidavits were deliberately or recklessly false, that the affidavits were not attached to the warrants, or that the issuing judges wholly abandoned their judicial roles in issuing the warrants.

---

[4]    The Government did not argue that the dog sniff for narcotics was proper.

For all of these reasons, the Court recommends denial of Gehl's Motion to Suppress evidence obtained through the search warrants at Government Exhibits 25, 26, 32 and 33.

**C.    Warehouse/Residence Search Warrants**

Gehl argues that the June 24, 2021 Search Warrants issued for warehouses and a residence at Government Exhibits 1 (Minnesota Warehouse), 3 (Lake Elmo Residence), 12 (Lake Elmo Residence), and 13 (California Warehouse) should be suppressed as the probable cause findings were based on information obtained through the other search warrants,[5] *supra*, that he sought to suppress (Gov't Exs. 14, 19, 25, 26, 32, and 33). Having recommended denial of Gehl's motion as to Government Exhibits 14, 19, 25, 26, 32, and 33, Gehl's fruit of the poisonous tree argument necessarily fails. As such, the Court recommends denial of the Motion to Suppress evidence as to Government Exhibits 1, 3, 12, and 13.

**III.    MAYKOSKI'S MOTION TO SUPPRESS EVIDENCE (DKT. 92)**

Maykoski challenges the search warrant and application at Government Exhibit 4, which is a search warrant signed by Magistrate Judge Leung on June 24, 2021 regarding the residence located at XXX East Maryland Avenue, Saint Paul, Minnesota ("Maryland

---

[5]    The Court also denies the motion as to these warrants because Gehl does not specify what information from the allegedly deficient search warrants infected these warrants. As the proponent of a motion to suppress evidence on the basis of a Fourth Amendment violation, Gehl "has the burden of establishing that his . . . Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted).

Avenue Residence") for evidence relating the distribution of marijuana and money laundering. (Dkt. 138 at 8-12.)

The Affidavit from SA Tschida in support of this the search warrant is the same as the Affidavit he provided in support of the Century Avenue Residence (Gov't Exs. 5-6). In addition to the underlying investigation relating to the DTO and Maykoski, as set forth in Section I.A of this Report and Recommendation regarding Government Exhibits 5 and 6, SA Tschida's Affidavit provides the following additional facts linking Maykoski to the Maryland Avenue Residence in support of probable cause for the search of the residence:

> The real property and premises known as [XXX] Maryland Avenue East, Saint Paul, Minnesota, is Maykoski's residence and was purchased on November 17, 2017, for $18,000 on a contract for deed. Building permits from the City of Saint Paul show that Maykoski demolished the structure on the property and that he paid approximately $120,000 for construction of a new structure on the property.
>
> Records obtained from DEED showed no reportable wages for Maykoski for the years 2017 through 2020. Bank records show that on June 1, 2019, Maykoski took out an automobile loan for $7,854.47, but was able to pay the loan off in cash in just six months.
>
> On November 4, 2019, Maykoski applied for a loan for a 2019 Harley Davidson motorcycle in the amount of $39,089.25. As of January 2021, the loan balance was only $4,603.74. Financial records reflect that Maykoski made cash payments of $12,706.84 and a one-time check payment of $21,778.67.
>
> On February 25, 2021, investigators saw a woman meet with Maykoski in the alley behind this residence. The woman was later stopped by the police and a search of her vehicle resulted in the seizure of approximately 60 grams of marijuana.
>
> Credit card records reveal that Maykoski has spent thousands of dollars on airline tickets to fly to California and for car rentals in California. As stated above, Maykoski drove directly to [XXX] Maryland Avenue East, Saint

Paul, Minnesota, after crates arrived from California on February 17, 2021, and April 26, 2021.

(Gov't Ex. 4 ¶¶ 37-41.)

Maykoski argues that the pertinent information contained in the application for a search warrant for his home was stale and as a result, probable cause did not exist at the time the search warrant was issued. (Dkt. 138 at 9.) In particular, Maykoski asserts that the totality of the information provided to the magistrate judge in the application for the June 24, 2021 search warrant for his home was stale—about 4 months old (February 17 and 25, 2021) and 2 months old (April 26, 2021). (*Id.*) Maykoski also contends that the Crime Stoppers tip was unreliable and should be excluded from the probable cause determination, especially in light of the fact that it was made in September 2020. (*Id.* at 10-11.)

The Court rejects Maykoski's argument that the magistrate judge could not consider the Crime Stoppers tip for a lack of reliability for the same reasons as set forth in the Court's analysis of Finch's Motion to Suppress (*supra*, Section I.A).

In addition, Maykoski complains that the Affidavit did not notify Magistrate Judge Leung that law enforcement saw Maykoski pass anything to the woman behind the Maryland Avenue Residence who was later stopped by law enforcement (at an unspecified time) with 60 grams of marijuana in her vehicle. (Dkt. 138 at 12.) However, there is no requirement for probable cause purposes that officers must observe drugs changing hands. *See generally*, *United States v. Acevedo*, No. 19-CR-201(2) (PAM/DTS), 2020 WL 401990, at *1 (D. Minn. Jan. 24, 2020) ("It contradicts common

sense to think that officers must actually observe drugs changing hands in order to establish probable cause.").

Regardless, even excluding the purported drug transaction between Maykoski and a woman at the Maryland Avenue Residence, the Court concludes that sufficient probable cause still supports the issuance of the search warrant. As to Maykoski's residence, the partially corroborated September 2020 tip provided that Finch, Maykoski, and David Gehl were receiving and distributing marijuana and that these individuals were traveling frequently, at least once a month, to California to purchase marijuana and ship it to Minnesota. In addition, the Affidavit is supported by shipping records showing at least 61 shipments between D & D Systems and Modern Waters since 2016, as well as officer observations of Finch, Maykoski, and Gehl going between California and Minnesota. Indeed, Maykoski was seen at the California Warehouse in February 2021, as were Finch and Gehl, and Finch was subsequently seen taking boxes and bags from the Minnesota Warehouse shortly after the arrival of the cases on February 17, 2021 to the Maryland Avenue Residence. The Affidavit also sets forth Maykoski's involvement with a shipment from the Minnesota Warehouse to the California Warehouse on April 5, 2021 and the April 26, 2021 arrival of a shipment to the Minnesota Warehouse when Maykoski was observed transporting garbage bags and boxes from the Minnesota Warehouse to two residences, including the Maryland Avenue Residence. Again, on June 7, 2021, Maykoski was seen arranging for a shipment to the California Warehouse and his phone was located in the vicinity of the California Warehouse on June 20, 2021, prior to another shipment back to the Minnesota Warehouse. Moreover, the records show that Maykoski

has had no reportable wages from 2017 through 2020, yet he was able to buy property and construct a new home at the Maryland Avenue Residence; he was able to take out a loan for a vehicle and pay it off in six months; and purchase a $39,089 Harley Davidson motorcycle and have it almost paid off, using cash payments of $12,706 and a one-time check payment of $21,778.  This information, taken together, supports the probable cause finding that Maykoski was involved a long-term drug distribution conspiracy through the June 24, 2021 signing of the search warrant.  While there are only two instances in February and April 2021 where Maykoski was seen taking possible contraband to the Maryland Avenue Residence, SA Tschida also testified that, based on his training and experience in financial and narcotics investigations, individuals who receive income from illegal sources often maintain within their residences items evidencing assets and personal financial transactions for extended periods of time, including years; currency, precious metal and jewelry can evidence accumulation of wealth from illegal activities, which are often maintained within an individual's residence; and persons who have participated in illegal activities for several years will often have in their residence items of evidentiary value because of their failure to understand the incriminating nature of certain innocuous appearing items or through inadvertence.  (Gov't Ex. 4 ¶ 65.)  The Affidavit's statements regarding a continuous course (through the date that the search warrant was signed) of drug trafficking by Maykoski and SA Tschida's belief, based on his training and experience, that evidence of drug trafficking would be found at the Maryland Avenue Residence, establishes probable cause that the evidence sought by the warrant for the Maryland Avenue Residence would be found at that location.  *See, e.g.*,

*United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007) ("[W]e have found probable cause to exist in cases in which officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity."); *Tellez*, 217 F.3d at 549 ("In this case there was evidence that [the defendant] was engaged in a continuing course of criminal activity, and we believe that it could fairly be inferred that he was keeping a supply of drugs and perhaps other evidence relating to his drug dealing in his home. Although, it is true that neither the informant nor the detective had actual knowledge that contraband was in [the defendant's] home, absolute certainty was not necessary: a fair probability is all that is required."); *see also Carpenter*, 341 F.3d at 671 ("As a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence."). In addition, the Court finds that the gap of several months between the April 2021 observation of Maykoski transporting items from the Minnesota Warehouse to the Maryland Avenue Residence and the June 2021 issuance of the search warrants was not stale given the ongoing nature of the alleged narcotics conspiracy. *See United States v. Smith*, 266 F.3d 902, 905 (8th Cir. 2001) ("In investigations of ongoing narcotic operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale.").

Based on the totality of the circumstances as set forth in the supporting Affidavit, the Court finds that the search warrant for the Maryland Residence was supported by sufficient probable cause and that Maykoski's motion to suppress should be denied.

Even if the Court found that probable cause was lacking, it would still recommend denial of the motion to suppress under the *Leon* exception.  Maykoski argues that the *Leon* exception does not apply under the third exception because the search warrant is so lacking in probable cause that it should have been apparent to a reasonable executing officer.  (Dkt. 150 at 6-7.)  As stated previously, with respect to the third exception, the Eighth Circuit has explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words."  *Proell*, 485 F.3d at 432 (quoting *Carpenter*, 341 F.3d at 670).  Given this Court's finding that the search warrant was supported by sufficient probable cause, the Court does not find that the officers' reliance on the issuance of the June 24, 2021 search warrant was entirely unreasonable.

For all of the reasons stated above, the Court finds that Maykoski's motion to suppress should be denied.

## IV.    MAYKOSKI'S MOTION TO DISMISS INDICTMENT[6]

Maykoski maintains that Count 2 of the Indictment, which alleges a money laundering conspiracy, should be dismissed because it does not allege on its face particular factual evidence of concealment of a financial transaction or an intent to conceal the nature, location, source, ownership, or control of the proceeds.  (Dkt. 94 at 4-5; Dkt. 138 at 6.)

---

[6]    The Government has agreed that the Motion to Dismiss Count II applies to all Defendants.  (Dkt. 134 at 73.)

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations omitted); *see also United States v. Palmer*, 917 F.3d 1035, 1039 (8th Cir. 2019) ("An indictment is adequate 'if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution.'") (quoting *United States v. Mann*, 701 F.3d 274, 288 (8th Cir. 2012)); *United States v. Hayes*, 574 F.3d 460, 472 (8th Cir. 2009) (quoting *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008)) ("An indictment adequately states an offense if: it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution.").

When considering a motion to dismiss the indictment on the basis of insufficiency, "[o]rdinarily, the Court's assessment is limited to the 'four corners' of the Indictment, and the Court should studiously avoid the consideration of evidence from sources beyond the Indictment." *United States v. Hughson*, 488 F. Supp. 2d 835, 841 (8th Cir. 2007) (citing *United States v. Hall*, 20 F.3d 184, 1087 (8th Cir. 1994)). "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted."

*Hayes*, 574 F.3d at 472. "Usage of a particular word or phrase in the indictment is not required as long as we can recognize a valid offense and the form of the allegation substantially states the elements. In fact, we will find an indictment insufficient only if an essential element of substance is omitted." *United States v. White*, 241 F.3d 1015, 1021 (8th Cir. 2001) (cleaned up). "An indictment is normally sufficient if its language tracks the statutory language." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) (citing *Hamling*, 418 U.S. at 117); *see also United States v. Whitlow*, 815 F.3d 430, 433 (8th Cir. 2016) (citations omitted).[7] The Court also notes that as with a drug conspiracy, proof of an overt act is not required to prove a money-laundering conspiracy in violation of § 1956(h). *See United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005) (citing *Whitfield v. United States*, 543 U.S. 209, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005)) ("Section 1956(h) does not require any such [overt] act be charged or proven.").

Here, Count 2 alleges that Defendants:

> did unlawfully, **knowingly and, intentionally conspire with each other** and with others known and unknown to the grand jury to conduct and attempt to

---

[7]    The Eighth Circuit in *Whitlow* found as follows:

> An indictment is sufficient if it contains the elements of the offense charged, lets the defendant know what he needs to do to defend himself, and would allow him to plead a former acquittal or conviction if he were charged with a similar offense. Usually an indictment that tracks the statutory language is sufficient. Whitlow does not specifically identify how the indictment is deficient. Instead he generally challenges it as "bare bones" and "without any factual statement of his involvement," such that none of the "elements of conspiracy can be proven." To the extent Whitlow's argument relies on a lack of proof, we agree with the district court that such a challenge to an indictment is not allowed.

*Whitlow*, 815 F.3d at 433.

conduct financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, **which in fact involved the proceeds of specified unlawful activity, that is, the unlawful sale and distribution of marijuana**, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, all in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h).

(Dkt. 46 at 2 (emphasis added).)

The elements for money laundering offense are as follows:

There are four elements to this offense: (1) defendant conducted, or attempted to conduct a financial transaction which in any way or degree affected interstate commerce or foreign commerce; (2) the financial transaction involved proceeds of illegal activity; (3) defendant knew the property represented proceeds of some form of unlawful activity; and (4) defendant conducted or attempted to conduct the financial transaction knowing the transaction was "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity."

*United States v. Slagg*, 651 F.3d 832, 844 (8th Cir. 2011) (quoting *United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008), quoting § 1956(a)(1)(B)(i)).

Defendants argue that Count 2 of the Indictment should be dismissed because it does not allege on its face particular factual evidence of concealment of a financial transaction or an intent to conceal the nature, location, source, ownership, or control of the proceeds.  (Dkt. 94 at 4-5; Dkt. 138 at 6.)  The Court finds that the Indictment adequately sets forth those elements and notifies Defendants that the money laundering claim stems from proceeds allegedly obtained from their sale of marijuana, in other words they were intentionally concealing the proceeds from the illegal sale of narcotics. What Defendants are essentially arguing for is for dismissal of the Indictment because the

Indictment does not set forth with particularity the theory of the Government's case as to factual evidence of concealment of a financial transaction or an intent to conceal the nature, location, source, ownership, or control of the proceeds.  "In an indictment the government need not allege its theory of the case or supporting evidence." *United States v. Hymes*, 113 F. App'x 755, 757 (9th Cir. Oct. 14, 2004) (marks and citation omitted) ("'In the present case, the money laundering counts in the indictment were legally sufficient because they adequately alleged each of the requisite elements of the offense.").  Even a bill of particulars, let alone an indictment, is not intended to "supplement discovery or to provide for the acquisition of evidentiary detail." *United States v. Afremov*, 2007 WL 2475972, at *2 (D. Minn. Aug. 27, 2007) (citing *United States v. Shepard*, 462 F.3d 847, 860 (8th Cir. 2006); *United States v. Matlock*, 675 F.2d 981, 986 (8th Cir. 1982)).  Indeed, Defendants have not asserted as part of the present Motion to Dismiss or David Gehl's Motion for Bill of Particulars (addressed in a separate Order) that they have not received sufficient discovery to allow them a sufficient basis to defend against the money laundering charges.[8]  *See generally United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (citation and quotation omitted) (finding that a motion to dismiss an indictment is not intended to be a pretrial determination of the sufficiency of the government's evidence).  Moreover, the Government has since filed a Bill of

---

[8]    Maykoski cites to *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995) in support of his motion to dismiss, which he claims found there was insufficient evidence of intent to conceal.  (Dkt. 94 at 5; Dkt 138 at 6-7.)  However, that case dealt with whether there was sufficient evidence of intent to conceal for the purposes of a conviction, and not the facial sufficiency of on an indictment.

Particulars with a list of assets subject to forfeiture as part of the Count 2 conspiracy, including residences, cryptocurrency, jewelry, boats, vehicles, and motorcycles. (Dkt. 135.) In other words, the Court finds that Defendants have sufficient notice of the Conspiracy to Commit Money Laundering count against them in the Indictment.

For all of these reasons, the Indictment provides Defendants notice of the money laundering conspiracy and the Motion to Dismiss the Indictment should be denied.

## V. THOMAS' MOTION TO SUPPRESS EVIDENCE (DKT. 75)

Thomas challenges the search warrant and application at Government Exhibit 9, which is a June 24, 2021 search warrant signed by Magistrate Judge Leung for a residence at XXXXX 138th Avenue North, Dayton, Minnesota ("the Dayton Residence") regarding evidence relating to the distribution of marijuana and money laundering on the basis that the Affidavit does not contain sufficient evidence connecting the Dayton Residence to any illegal activity. (Dkt. 140 at 1, 3-4.)

Similar to Maykoski, the Affidavit from SA Tschida in support of this search warrant is the same as the Affidavit he provided in support of the Century Avenue Residences (Gov't Exs. 5-6). In addition to the underlying investigation relating to the DTO and Thomas, as set forth in Section I.A of this Report and Recommendation, *supra*, SA Tschida's Affidavit provides the following additional facts linking Thomas to the Dayton Residence to support probable cause that evidence of narcotics[9] and money laundering could be found at this residence:

---

[9] While Thomas argues that it is telling that SA Tschida did not seek authorization to search the residence for drugs (Dkt. 140 at 4), SA Tschida also requested authorization

The real property and premises known as [XXXXX] 138th Avenue North, Dayton, Minnesota, is Thomas' residence. As stated above, on April 26, 2021, investigators saw Thomas use a forklift to off-load three crates at the D & D Systems warehouse from a delivery truck that had just arrived from California. Investigators then saw him leave the warehouse several hours later and place a large garbage bag and three cardboard boxes into the back of his truck. Investigators then saw Thomas drive to [XXX] Como Avenue, Saint Paul, Minnesota, and carry the items into the house with the help of Brian Arndt. Thomas then left the area and drove to [XXXXX] 138th Avenue North.

Credit card information obtained during the investigation reflects that a William Fitzgerald purchased round-trip tickets for himself and Thomas for flights to Sacramento on April 11, 2021, which correlates with the time crates were packaged and shipped from the Modern Waters warehouse to the D & D Systems warehouse.

For the reasons discussed above, there is probable cause to believe that [XXXXX] 138th Avenue North, Dayton, Minnesota, will contain incriminating credit card and travel records, other documents and records linking the members of the DTO to drug trafficking and money laundering activities, and those items listed **in Attachment A**.

(Gov't Ex. 9 ¶¶ 57-59 (emphasis added).)

Given the evidence supporting the DTO's continuing long-term marijuana distribution involving shipments between California and Minnesota; evidence of Thomas' involvement with that distribution at least three times over a six-month period, in both California and Minnesota, including in one instance where he signed for one of the shipments from Modern Waters (*id.* ¶¶ 21-22), and one instance where he appeared to take garbage bags and boxes from the Minnesota Warehouse to the Como Residence and then proceed to his Dayton Residence (*id.* ¶ 23); coupled with SA Tschida's detailed

---

to search for all items listed in Attachment A, which included marijuana and other controlled substances. (Gov't Ex. 9.)

assertions that, based on his training and experience in financial and narcotics investigations, individuals who receive income from illegal sources often maintains within their residences items evidencing assets and personal financial transactions for extended periods of time (*id.* ¶ 65), the Court finds that sufficient probable cause exists for the issuance the search warrant for the Dayton Residence. *See United States v. Keele*, 589 F.3d 940, 942-44 (8th Cir. 2009) (finding it was reasonable to infer that contraband would be found at personal residence where "evidence of drug manufacturing and distribution" had been recovered from a single car accident scene and "was linked to [the defendant's] residence through the experienced opinion of [the affiant] that drug manufacturers often keep contraband and proceeds at their personal residences"); *see also United States v. Cruz-Martinez*, No. 21-CR-151 (PJS/ECW), 2021 WL 5828107, at *5 (D. Minn. Nov. 1, 2021), *R. & R. adopted by*, 2021 WL 5827748 (D. Minn. Dec. 8, 2021). Although each piece of information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, and although the accumulated facts here present a close call for probable cause analysis, taken together and given the totality of the circumstances, this Court concludes that a reasonable person could believe there was a fair probability that evidence of a crime would be found in the information sought pursuant to this search warrant.

Even to the extent probable cause is lacking the Court still recommends denial of the motion to suppress based on the *Leon* exception. Similar to Maykoski, Thomas argues that the *Leon* exception does not apply under the third exception because the search warrant is so lacking in probable cause that it should have been apparent to a

reasonable executing officer that they could not rely on the search warrant issued by Magistrate Judge Leung. (Dkt. 140 at 5-6.) Thomas focuses on what he claims is the complete lack of nexus between the house and any illegal activity, whether it be narcotics activity or money laundering. (*Id.* at 5.) The Court cannot find the officer's reliance on the search warrant entirely unreasonable given Thomas' involvement with the DTO shipments between California and Minnesota, along with observations that he traveled to his Dayton Residence after he took items from the Minnesota Warehouse from one of the California shipments.

For all of the reasons, Thomas' motion suppress should be denied.

## VI.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Defendant Douglas Robert Finch's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches (Dkt. 66) be **DENIED**;

2.    Defendant Daniel Richard Thomas' Motion to Suppress Physical Evidence Seized Pursuant to Warrant (Dkt. 75) be **DENIED**;

3.    Patrick Thomas Maykoski's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 92) be **DENIED**;

4.    Defendant Patrick Thomas Maykoski's Motion to Dismiss Count II of the Indictment (Dkt. 94) be **DENIED**; and

5.    Defendant David William Gehl's Motion to Suppress – Search and Seizure Warrants (Dkt. 118) be **DENIED**.

DATED: February 9, 2022                    *s/Elizabeth Cowan Wright*
                                           ELIZABETH COWAN WRIGHT
                                           United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).